IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No.   06-cv-02418-WDM-MJW

THE ARK INITIATIVE, *et al.*,

        Plaintiffs,

v.

UNITED STATES FOREST SERVICE, *et al.*,

        Defendants.

---

## ORDER ON APPEAL OF FINAL AGENCY ACTION

---

Miller, J.

        This matter is before me on Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief (ECF No. 36) and Memorandum in Support of Appeal of Final Agency Action (ECF No. 66).  Following oral argument, the parties submitted proposed orders. After full review and for the reasons that follow, the administrative decisions are affirmed.

### Background

        Plaintiffs allege that Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, in their pursuit of future expansion of the Snowmass Ski Area ("Snowmass"), located near Aspen, Colorado.  Snowmass is operated by Aspen Skiing Co. ("Aspen Skiing") and includes more than twenty ski lifts and 137 miles of improved downhill ski trails.  Approximately eighty percent of Snowmass is within the White River National Forest ("White River").  Aspen Skiing operates Snowmass under a long-term special use permit ("SUP") (AR 5566-92) issued by the United States Forest Service ("Forest Service").

Adjacent to the developed ski area is the Burnt Mountain, a tract of national forest land containing mature forest, aspen stands, and wetlands. Burnt Mountain provides habitat for wildlife and plant species, including some sensitive species. It has been designated by the United States Fish & Wildlife Service ("FWS") as suitable lynx habitat and is used by elk at various times of the year. It does not have ski lifts or developed runs but is used for backcountry recreational activities including skiing.

The Snowmass SUP requires that Aspen Skiing submit to the Forest Service a Master Development Plan ("MDP"), which provides a comprehensive and systematic outline of the resort as it is envisioned in the future. Several MDPs have been in place since Snowmass began operation in the 1960s; most relevant here is the MDP submitted by Aspen Skiing around August 1991. In 1994, acting on the submitted MDP, the Forest Service issued a Final Environmental Impact Statement ("1994 EIS"), which compared a number of alternatives for development pursuant to the MDP, including a no action alternative. AR 3124-4184. In March 1994, the Forest Service issued a Record of Decision ("1994 ROD") approving portions of the MDP based on the 1994 EIS. AR 4185-4241. The 1994 ROD also disapproved of some portions[1] of the 1991 MDP and did not authorize these proposed activities.

In 1995, pursuant to ESA Section 7, the Forest Service consulted with FWS regarding the impact the actions proposed in the MDP would have on threatened and endangered species. FWS prepared a Biological Opinion ("1995 BiOp") (AR 4402-28) concluding that the projects in the MDP, as proposed, would likely jeopardize certain

_____

[1]The components not authorized were a large summit facility on Burnt Mountain, summer use of the Burnt Mountain gondola, and Eastern Burnt Mountain skiing pod. AR 4209-10.

protected fish but also listing alternatives to minimize or avoid such consequences.  The

1995 BiOp also stated:

> If new information becomes available, new species listed, or should there be
> any changes in the total average annual amount of water depleted by this
> project . . . or any other project change which alters the operation of the
> project from that which is described [in the Master Plan] and which may
> affect any endangered or threatened species in a manner or to an extent not
> considered in this biological opinion, . . . formal section 7 consultation should
> be reinitiated.

AR 4419.

FWS listed the Canada lynx as "threatened" in 2000.  Thereafter, in 2002, the

Forest Service revised its Land and Resource Management Plan ("2002 Forest Plan"), the

governing document for administering White River.  AR 2392-2701.  This document sets

the management, protection, and use standards that the Forest Service must follow when

authorizing projects in White River, including ski area expansions such as the one

proposed by Snowmass.  The 2002 Forest Plan inventoried and designated a portion of

Burnt Mountain as the Burnt Mountain Inventoried Roadless Area ("Roadless Area").

Based on the 2002 Forest Plan, FWS conducted another ESA Section 7 consultation and

prepared another Biological Opinion ("2002 BiOp").  AR 4429-90.  The 2002 BiOp

determined that the 2002 Forest Plan "will not jeopardize the continued existence of the

Canada lynx" (AR 4471) although it would "adversely affect" the lynx (AR 4429).  FWS

articulated various required mitigation measures and agency discretionary conservation

recommendations.

In 2003, Aspen Skiing sought to amend the 1994 MDP by submitting a master plan

amendment to the Forest Service (the "2003 MPA").  AR 5741-5904.  The 2003 MPA

projected actions such as construction or replacement of ski lifts, expansion of ski terrain

and facilities, new downhill ski trails, a vehicle maintenance facility, water storage ponds and expanded snowmaking, and construction of a new complex (including condominiums, hotels, shops, restaurants, and open-air gondola) at the Base Village (the "Base Village Project").  AR 5778–97.  The 2003 MPA was not subjected to any NEPA analysis and was "accepted" rather than "approved."  See April 3, 2008 letter from Jim M. Upchurch, District Ranger of the Forest Service, AR 5898–99 ("[T]he [2003 MPA] document itself will not be 'approved' by the Forest Service.  It is, however, 'accepted' as a guiding document for the future development of the Snowmass Ski Area, and helps us to better evaluate future connected actions when evaluating smaller site specific projects at the ski area.").  The Forest Service expressly noted that acceptance did not mean agreement on any proposed action, which would be subject to further site-specific analysis and evaluation as "an integral part of any future NEPA analysis and related decision document."  *Id.*

Subsequently, on May 2, 2003, Aspen Skiing sought to implement three of the projects outlined in the 2003 MPA: (1) the Sam's Knob express lift installation and grading project ("Sam's Knob Project"); (2) the Burnt Mountain trail development ("Burnt Mountain Project"); and (3) the Big Burn lift replacement and realignment ("Big Burn Project").  Together, these three projects became known as the Snowmass Ski Area Improvements Project ("Improvements Project").  AR 3086-89, 4751.

With the exception of one egress trail in connection with the Burnt Mountain Project, all of the proposed activities were previously evaluated under the 1994 EIS and approved in the 1994 ROD.  However, changed circumstances necessitated further NEPA evaluation.  Therefore, the Forest Service initiated the NEPA process by starting work on an Environmental Assessment ("EA").  Pursuant to ESA Section 7 and the 2002 BiOp, the

Forest Service also consulted with FWS. In March 2004, the Forest Service issued its Biological Assessment ("2004 BA") (AR 4257-86), and thereafter the FWS concurred with these opinions in a Biological Opinion ("2004 BiOp") (AR 4509-43). The 2004 BiOp identified potential impacts of the Improvements Project to lynx habitat, measures to mitigate the habitat loss, including requiring the Forest Service to provide additional lynx winter foraging habitat by conducting vegetation management on 43 acres of forested land within another area of Burnt Mountain. AR 4257-4332, 4509-43. It was determined that the 2003 MPA was "not likely to jeopardize the continued existence of the Canada lynx" and the negative effects would not constitute an incidental take of the lynx. AR 4534.

The Forest Service issued a Draft Environmental Assessment ("2004 Draft EA") in December 2004 (AR 6464-6538) and a Decision Notice and Finding of No Significant Impact ("FONSI") on March 25, 2005 (AR 4672-83). Much of the 2004 Draft EA was tiered to studies and findings contained in the 1994 EIS. AR 6468. The 2004 Draft EA and FONSI were rescinded shortly thereafter. A second draft environmental assessment was issued to the public on July 20, 2005 ("2005 Draft EA"), analyzing the Burnt Mountain and Big Burn Projects. AR 6539-6844. The Forest Service determined that the Sam's Knob Project was previously approved in the 1994 plan, leaving the Burnt Mountain and Big Burn projects subject to review. AR 4606. Public comments were received on both the 2004 Draft EA and the 2005 Draft EA. Plaintiffs submitted public comments on the 2005 Draft EA opposing the proposed actions and arguing that Burnt Mountain was undeveloped and roadless, provided valuable backcountry skiing and other recreational opportunities, and provided habitat for the lynx and other species. Plaintiffs requested that the Forest Service prepare an EIS and evaluate alternatives to developing Burnt Mountain.

Plaintiffs also requested that the Forest Service evaluate the direct, indirect, and cumulative impacts of all of the activities proposed by the 2003 MPA.

The NEPA analysis did not include several other aspects of the 2003 MPA that are being implemented. One is the Base Village Project, which is located entirely on private land. Another is various improvement and expansion projects around the Elk Camp area of the ski area, including a gondola, beginner ski area, summer trails, and associated infrastructure (the "Elk Camp Project"). The proposal for the Elk Camp Project was submitted after the proposals at issue here and was analyzed thereafter. See March 2006 Environment Assessment for Proposed Elk Camp Beginner Park and Summer Multiple Use Trails, AR 7054-7255. The Forest Service took the position that the Base Village Project did not have to be analyzed because it is located entirely on private land and is not connected, as defined by NEPA, to the Improvements Project. AR 4861-62.

The Forest Service issued the finalized environmental assessment ("2006 Final EA") in February 2006. AR 4746-4868. Like both the draft EAs, the 2006 Final EA included three alternatives: no action, the proposed action, and a modified action alternative. AR 4754–59. The modified action alternative was similar to the proposed action, but included certain changes such as, *inter alia*, limiting the elevation cut at Sam's Knob to 10-12 feet, rather than 16 feet; a loss of 100 feet of elevation in the Burnt Mountain lift; and conversion of the Big Burn lift from a 6-passenger lift to a 4-passenger lift. AR 4758–59. At the same time that the Final EA was released, the Forest Service issued a Decision Notice ("DN") and Finding of No Significant Impact ("FONSI"). AR 4685-97. The DN selected the modified action alternative because the Forest Service felt that it "better [met] the purpose and need of the proposed actions, and better address[ed]

6

resource issues that were identified during the site specific analysis phase of the EA process." AR 4690. The DN authorized the construction of one down hill ski run and egress trail activities on the Burnt Mountain Project, authorized the Big Burn Project, and reaffirmed "the decision made in the 1994 Snowmass ROD for the Sam's Knob Express Lift and associated Summit Re-grade project."[2] AR 4687.

On April 10, 2006, Plaintiffs and other parties filed an administrative appeal of the 2006 Final EA, FONSI, and DN. In May 2006, the Deputy Regional Forester denied Plaintiffs' requests for relief in all respects except that he required further NEPA analysis prior to implementation of the skier egress trail in the Burnt Mountain Roadless Area. AR 5121-22. The further NEPA analysis, however, was authorized to be conducted separately from the NEPA analysis already conducted. *Id.*

Plaintiffs filed this action on September 8, 2006 in the District of Columbia. The case was transferred to this district on December 4, 2006. Plaintiffs filed an amended complaint (ECF No. 36) on January 18, 2007, asserting five claims for relief: (1) the Improvements Project violated NEPA and the APA; (2) the 2003 MPA violated NEPA and the APA; (3) the agency's response to certain Public Records Requests violated NEPA, FOIA, and the APA; (4) the Improvements Project violated ESA and APA; and (5) the 2003 MPA violated ESA and APA. Plaintiffs' opening brief and proposed order, however, do not address the third claim for relief, and I thereafter deemed the claim to be waived. Plaintiffs seek review of the agency's decisions pursuant to *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994).

---

[2]Plaintiffs' pleadings and proposed order do not contest that the 1994 ROD had approved the Sam's Knob project and no issue concerning that project remains.

Standard of Review

Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, which governs here, the Plaintiffs must ultimately show that the agency's process was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Olenhouse,* 42 F.3d at 1573-74. This generally involves a review of the agency's decision-making process to determine whether "the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Id.* at 1574. An agency decision will be considered arbitrary and capricious "if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citations omitted). I conduct a plenary review of the record to determine whether the agency's action was supported by substantial evidence. *Id.* at 1576. My review has a substantive component with respect to the ultimate conclusion of no significant impact as well as a review of the agency's procedural compliance. *Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002).

The substantive law governing Forest Service's decisions are NEPA and ESA. NEPA requires agencies "to consider environmentally significant aspects of a proposed action, and, in so doing, let the public know that the agency's decisionmaking process includes environmental concerns." *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1162 (10th Cir. 2002). Specifically, agencies are required to take a "hard look" at the environmental consequences of a proposed action where the action could have a significant effect on the environment. *Id.* at 1162-63. An EA is a document

8

that, under NEPA, provides "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a). If the environmental assessment results in a finding of no significant impacts, an EIS is not required. 40 C.F.R § 1508.13. An agency must generally prepare an EIS if the environmental effects of a proposed action are highly uncertain. *Nat'l Parks & Conservation Assoc. v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001).

Congress enacted the ESA to conserve endangered and threatened species. 16 U.S.C. § 1531(b). Section 7 of the ESA requires each federal agency ("action agency") to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). If the action agency determines that its action will have no effect on a listed species or critical habitat, the consultation requirements are not triggered and the action agency does not need to take any further steps to consult with the relevant federal wildlife agency, which in this case is the FWS. 50 C.F.R. § 402.12(d)(1); *Sw. Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1447 (9th Cir. 1996). If an action agency determines that its proposed action "may affect" a listed species, then that agency must consult with FWS. 50 C.F.R. § 402.14(a).

Discussion

Of the remaining claims for relief, two, the Second and Fifth Claims, focus on the 2003 MPA and two, the First and Fourth Claims, focus on the 2006 Improvements Project. I will address the claims in that sequence.

A.    2003 MPA

1.    Final Agency Action

Plaintiffs assert that acceptance of the 2003 MPA should have been subjected to NEPA and ESA analysis.  Defendants argue that acceptance of the 2003 MPA is not a final action under the APA and that there is no jurisdiction to review that decision.  5 U.S.C. § 704; *Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1328 (10th Cir. 2007) (section 704 limits judicial review to "final agency action for which there is no other adequate remedy in a court.").  I agree with Defendants.

Arguably, the 2003 MPA might be considered an agency action because the MPD is part of the SUP and the APA recognizes that agency action includes "the whole or a part of an agency ... license"  5 U.S.C. § 551(13); *Ctr. for Native Ecosystems,* 509 F.3d at 1328 (noting that a "license" is defined to include "the whole or a part of an agency permit") (citing 5 U.S.C. § 551(13)).  However, I agree that the action is not final.  The two conditions that must be met to constitute final action are: (1) "the action must mark the 'consummation' of the agency's decision making process;" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences flow."  *Pennaco Energy, Inc. v. United States Dep't of Interior*, 377 F.3d 1147, 1155 (10th Cir. 2004) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  "If an agency has issued a 'definitive statement of its position, determining the rights and obligations of the parties,' the agency's action is final notwithstanding '[t]he possibility of further proceedings in the agency' on related issues, so long as 'judicial review at the time [would not] disrupt the administrative process.'"  *Ctr. for Native Ecosystems,* 509 F.3d at 1329 (quoting *Bell v. New Jersey*, 461 U.S. 773, 779-80 (1983)).

The Forest Service's acceptance of the conceptual 2003 MPA does not meet these

criteria. The 2003 MPA merely discloses Aspen Skiing's goals and objectives, AR

5748-50, the existing conditions, AR 5762-76, and Aspen Skiing's desired future

conditions, AR 5778-96. The Forest Service expressly noted that the acceptance of the

2003 MPA "in no way guarantees that all elements represented here will be completed at

any time in the future." AR 5751. Nor does the agency's acceptance mean that all of the

elements described in the 2003 MPA will be approved in the future, that the Forest Service

has completed its environmental review of elements described in the 2003 MPA, or that

the Forest Service completely agrees with Aspen Skiing on all of the listed actions. AR

5898-99. Instead, the Forest Service accepted the 2003 MPA as a guiding document for

Aspen Skiing's future development of the Snowmass Ski Area that would help the agency

understand Aspen Skiing's vision for the ski area and evaluate future connected actions

when analyzing site-specific projects. AR 5899. Accordingly, it is not a "definitive

statement of [the Forest Service's] position determining the rights and obligations" of

Aspen Skiing or other parties. More decisions remain to be made, depending on what

Aspen Skiing actually proposes and the further required NEPA analysis, which means that

it is not the consummation of the agency's decision-making process. Thus, the

acceptance of the 2003 MPA is not a final agency action.

Plaintiffs argue that the acceptance is a final action in that it will serve as a "final"

blueprint for future action and will guide future NEPA analyses. Plaintiffs also argue that

because master plans are generally subjected to NEPA analysis that an amendment to

such a plan should undergo the same process. I disagree. Although I do not by my ruling

suggest that all amendments to master plans should not be considered a final agency

action, under the circumstances presented here I conclude that the Forest Service's action

is not final.  The 2003 MPA to a large extent merely clarifies and adds detail to previously

analyzed and approved projects in the original MDP.  To the extent it contains new

material, it acts only to provide guidance for future decision; since nothing is expressly

authorized, no person could assert any rights or obligations based on it.  I conclude, like

the Ninth Circuit in *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660 (9th Cir. 1998), that

the plan at issue does not contain any binding decisions or commitments that would have

an immediate impact on the physical environment and so is not a final agency action.

The two cases cited by Plaintiffs, *Envtl. Prot. Info. Ctr. v. United States Forest Serv.*,

No. C-02-2708 JCS, 2003 WL 22283969 (N.D. Cal. Sept. 5, 2003) (unpublished), and

*California v. United States Forest Serv.*, No. C 04-02588 CRB, 2005 WL 1630020 (N.D.

Cal. July 11, 2005) (unpublished), are distinguishable from the facts presented here.  Both

concern Fire Management Plans developed by the Forest Service and were determined to

be final agency actions because they made final decisions in certain respects for the forest

including establishing policies and procedures that were binding on the forest officials.  In

those cases, had a fire occurred the day after the Plans went into effect, the procedures in

the Fire Management Plans would have been used.  For example, the Fire Plan in

*California* classified forest areas into different categories; depending on the category, a fire

might be suppressed or not.  Here, by contrast, nothing will happen until specific concrete

implementation proposals are offered and subjected to NEPA analysis.

2.     ESA Section 7

Similarly, I agree with Defendants that acceptance of the 2003 MPA did not trigger

ESA Section 7 obligations.

ESA requires federal agencies to, "in consultation with and with the assistance of

the Secretary, insure that any action authorized, funded, or carried out by such agency . . .

is not likely to jeopardize the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification of habitat of such species . . .

determined . . . to be critical. . . ." 16 U.S.C. § 1536(a)(2).  Under the applicable

regulations, a "federal action" includes activities or programs of any kind authorized,

funded, or carried out, in whole or in part, by federal agencies, such as: "(a) actions

intended to conserve listed species or their habitats; (b) the promulgation of regulations;

(c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or

grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or

air." 50 C.F.R. § 402.02.  I conclude that there is no federal action because the 2003 MPA

does not authorize (or fund or carry out) any specific activities and is not similar to the

types of actions described in the regulations.  "A plan or vision is certainly a precursor to

'agency action,' but neither is action requiring § 7(a)(2) consultation."  *Forest Guardians v.*

*Forsgren*, 478 F.3d 1149, 1158 (10th Cir. 2007).

Plaintiffs argue that the acceptance of the 2003 MPA is similar to the adoption or

amendment of a Land and Resource Management Plan; as recognized in *Forsgren*, this

triggers ESA review.[3]  478 F.3d at 1154.  Although both are kinds of "road maps," Land

and Resource Management Plans guide the actions of a federal agency, rather than a

private permit holder.  *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1080

(9th Cir. 2001) (noting that Land and Resource Management Plans are "comprehensive

management plans which govern agency action in forest planning decisions.  The Forest

Service has plenary control in this area because it is the agency charged with

---

[3]The 2002 Forest Plan was indeed analyzed under NEPA and ESA.

13

promulgating, approving and implementing LRMPs on Forest Service land."). This brings it closer to the definition of an action "authorized, funded, or carried out by [a federal] agency." By contrast, the acceptance of the 2003 MPA does not even authorize any activity by the private actor and the role of the federal agency is far more limited, as the Forest Service primarily reviewed the 2003 MPA for consistency with the 2002 Forest Plan and other governing documents.

Moreover, even if the Forest Service's acceptance of the 2003 MPA was construed as an "action" for Section 7 purposes, there is no duty for the Forest Service to consult because the acceptance of the 2003 MPA has no effect on listed species. If an agency determines that a particular action will have no effect on a listed species, Section 7(a)(2)'s consultation requirement is not triggered. *Sw. Ctr.*, 100 F.3d at 1447-48 (citing *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994)). Here, Plaintiffs fail to identify any aspect of the Forest Service's acceptance of the 2003 MPA that may affect the lynx or the listed fish. Indeed, they cannot because, as explained above, acceptance of the 2003 MPA does not provide Aspen Skiing with any additional authorization beyond that which it already possesses under the SUP or previous site-specific approvals of proposed activities. Acceptance of the 2003 MPA has absolutely no on-the-ground effect and thus no effect on lynx or the listed fish. Therefore, consultation is not required. *Forsgren*, 478 F.3d at 1156; *id.* at 1157 ("nowhere in the amended complaint can we find any mention . . . of an authorized program, practice, project, or activity that might amount to 'action' threatening the continued existence of the lynx.").

Because the approval of the 2003 MPA does not amount to final agency action under the APA, and moreover would not trigger ESA consultation duties, the Defendants'

decision will be affirmed.

B.      2006 Improvements Project

Plaintiffs allege that the 2005 Draft and 2006 Final EAs for the 2006 Improvements Project violate NEPA by failing to analyze: (1) the cumulative impacts of the Project: (2) the impacts of the activities on elk; (3) the impacts to backcountry recreation of the proposed actions on Burnt Mountain; and (4) a reasonable range of alternatives to the proposed action.[4]  Plaintiffs also assert that the Forest Service improperly segmented analysis of the Burnt Mountain ski trails and the egress trails by not analyzing them in one document.

1.      Cumulative Impacts

Once a federal action exists, the NEPA process must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts of past, present, and reasonably foreseeable future actions.  *Custer Cnty Action Ass'n v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001) (citations omitted).  Plaintiffs contend that Defendants did not adequately consider the effects of two additional components of the 2003 MPA as cumulative impacts, specifically the new Base Village construction on private property adjacent to the Forest Service land and the Elk Camp Project.

As noted, the Elk Camp Project was proposed after most of the work on the EA was completed for the Improvements Project and was subjected to a later NEPA analysis.  At the time that the scope of the EA was determined, the Forest Service concluded that Elk Camp Project was not sufficiently definite to be included in the analysis.  Given the discretion granted to the Forest Service in determining the scope of the proposed project, I

_____

[4]I understand these to be the final areas of concern for Plaintiffs based on their proposed order, which narrowed the scope of matters in dispute.  See Plaintiffs' Proposed Order (ECF No. 85).

15

conclude that this decision was not arbitrary or capricious or an abuse of discretion. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976); 42 U.S.C. § 4332(2)(C).

With respect to the new construction projects at the Base Village, the Forest Service at the time determined that it was not a connected action, as that is defined by NEPA. In determining the scope of an analysis under NEPA, the following types of actions should be considered in the same study:

> (a) Actions (other than unconnected single actions) which may be:
>
> (1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:
> (i) Automatically trigger other actions which may require environmental impact statements.
> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.
> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25

The Forest Service's decision to consider the Base Village Project as unconnected to the Improvements Project is not arbitrary or capricious. The Improvements Project did not automatically trigger any action connected to the Base Village Project and they proceed independently of the Base Village building activities. The only apparent connection between them are the ski lifts that connect the Base Village to the upper parts of the mountain, which were previously analyzed in the EIS. AR 5898. The fact that the Base Village may be physically linked by a ski lift to the areas examined in the EA does not mean that these are connected projects for NEPA purposes. In addition, it was determined that the Base Village Project would not increase the number of skiers at a time, the initial access capacity, or the ski area terrain capacity approved in the 1994 ROD. AR

16

4832, 4861-62.  On this record, I see no abuse of discretion.

    2.    <u>Impacts on Elk</u>

Similarly, Plaintiffs argue that the agency's analysis of the Improvements Project's impact on elk was arbitrary and capricious because it also did not consider the effects of the Elk Camp Project or Base Village Project.  The failure to include these additional projects has already been addressed; as noted, the Elk Camp Project was analyzed separately under NEPA, and Plaintiffs have argued that the Elk Camp Project EA properly analyzed cumulative effects, including those on elk.  AR 7183-86.

The EA states that the Improvements Projects are "very similar in potential effects as those actions analyzed in the Snowmass EIS.  No new information has arisen to suggest that any resource conditions have changed since the EIS was prepared, other than the increased level of residential development on private land adjacent to NFS land on the northern most portions of the permit boundary."  AR 4773.  The EA cites to data indicating that "the 2004 [elk] population is actually higher than that originally observed during the EIS analysis."  AR 4774.  Various explanations are offered for this, including that projects studied in the 1994 EIS had not yet been constructed, that access to Burnt Mountain had become more restricted, and the Forest Supervisor had implemented closures in the Burnt Mountain area between May 15th and June 20th [calving season].
*Id.*  The EA notes that the proposed action will result in clearing of terrain for trail development in potential elk habitat on Burnt Mountain.  *Id.*  Because a concern for elk viability is the quality and availability of calving areas, according to the 1994 EIS, the EA examined the impact of the Improvements Project on the known calving area within the permit boundary and found only one traverse that would intersect it.  AR 4775.  A separate

management species indicator ("MIS") evaluation focused specifically on effects to elk (and selected other species). Appendix H to EA, AR 3020-3049. The MIS concludes that the Improvements Project would affect foraging habitat and possibly displace some individual animals but that essentially the Improvements Project would not reduce elk habitat effectiveness, particularly since winter range (considered more important than summer range for this area) would not be affected. AR 3036-3039 (describing impacts as "discountable," "insignificant," and "immeasurable").

Plaintiffs raise several criticisms with the MIS and EA, primarily taking issue with the method used by the Forest Service in determining the scale against which impacts should be measured. The Forest Service primarily examined the significance of the actions on all elk habitat for the relevant Data Analysis Unit ("DAU"), a system used by the Colorado Division of Wildlife, which encompasses a fairly large area. AR 3038. I note that there was also discussion of the specific impacts on the Burnt Mountain Project area. AR 3036-37. Plaintiffs have not shown that this was arbitrary and capricious, particularly given that elk are migratory and this is the system used by another responsible agency. Plaintiffs also argue that reliance on the 1994 EIS for impacts on elk was improper because of changes in circumstances since then. However, the only other change identified is some increased summer use, which is a factor the Forest Service considered in the MIS. AR 3037. Moreover, Plaintiffs have not shown that the Improvements Project is connected to summer recreational activities in the Burnt Mountain area or will lead to a significant increase in use.[5]

_____

[5]Plaintiffs also point to a comment letter from the Colorado Division of Wildlife in response to the draft EA, in which CDOW notes that increased summer recreation use could impact elk. AR 4571.

Plaintiffs contend that the agency has not analyzed the effectiveness of the summer closures.  Again, I see no error.  The Forest Service provides an explanation for why these actions are taken based on the location of the calving area and seasonal dates of calving and migration, which is adequate to demonstrate "a rational connection between the facts found and the decision made."  In addition, as noted by Defendants, elk will continue to be monitored pursuant to the 2002 Forest Plan.  Therefore, the agency's handling of this aspect of the EA is not arbitrary, capricious, an abuse of discretion, or contrary to law.

3.    Impacts to Backcountry Recreation

Plaintiffs argue that Defendants violated NEPA by failing to analyze the impacts to backcountry recreation, specifically backcountry skiing.  Defendants respond that Burnt Mountain provides only "semi-backcountry" recreation opportunities.  The EA stated that Burnt Mountain provides a "semi-backcountry type" of skiing and snowboarding terrain. AR 4753.  "Semi-backcountry" skiing in the EA refers to skiing that is either outside of the ski area boundary or in an area within the permit boundary, such as Burnt Mountain, that is often unmanaged with respect to snow conditions, as well as from a facility and ski patrol based "level-of-care" standpoint.  AR 4722.  True backcountry skiing does not involve the use of vehicles, ski lifts, or other means of elevation-gained access, while semi-backcountry skiing typically involves a short hike from a lift or road or the use of a snowmobile as part of the experience.  *Id.*  The Forest Service has stated that while the skiing terrain on Burnt Mountain would "never truly be 'backcountry' terrain," the Burnt Mountain terrain had "the potential to provide a 'semi-backcountry' type of experience that involves a short hike," because there is presently no lift service to the top of Burnt Mountain.  AR 4703; see AR 4720-21.

In their proposed order, Plaintiffs state that it is not the label that is of importance, but rather their interest in maintaining the type of skiing that was available on Burnt Mountain before the implementation of the Burnt Mountain Project–*i.e.*, skiing on relatively undeveloped mountain land. They contend that this experience will be affected by having more people and wider ski runs as a result of the Burnt Mountain Project and that the Defendants did not adequately respond to their concerns.

I agree with Defendants that the Forest Service provided an adequate explanation for why it did not consider impacts on "true" backcountry recreation and that the failure to do so was not arbitrary and capricious. To the extent that Plaintiffs argue that the EA did not adequately consider effects on semi-backcountry skiing, I conclude that this fails as well. The record reveals that the Defendants considered and addressed comments about impact of the Project on the relatively undeveloped character of Burnt Mountain. The Forest Service recognized that there will be some increase in skier density, although not in excess of what was analyzed and deemed acceptable in the 1994 EIS. AR 4718. The Forest Service also noted that the currently-used trail on Burnt Mountain already receives significant use and that opening an additional trail would "most likely result in lower skier densities per acre overall and thus leave the snow conditions between storm events in a more 'natural', un-skied condition." AR 4720. It was also noted that "the entire area lies within the Snowmass Ski Area boundary, and has gained previous approvals to fully develop the Burnt Mountain portion of the ski area, as disclosed in the 1994 EIS and ROD." AR 4721.[6] Mere disagreement with the Forest Service's conclusions is not the

---

[6]As noted by Defendants, many of Plaintiffs' challenges in this regard relate to the categorization of the Project area by the 2002 Forest Plan, which may be more appropriately addressed during the Forest Plan revision process, not through a

standard for demonstrating arbitrary or capricious action by an administrative agency.

4.     Reasonable Range of Alternatives

Plaintiffs contend that the EA did not examine a reasonable range of alternatives and that the Forest Service did not consider the option of not developing Burnt Mountain. The EA did include a "no action" alternative, *i.e.*, no development beyond what was previously approved in the 1994 ROD.  To the extent that Plaintiffs argue that a "no development" option should have considered negating the previously approved proposals, Plaintiffs offer no legal authority to demonstrate that the failure to do so was an abuse of discretion or contrary to law.

Otherwise, I agree that the Forest Service examined a reasonable range of alternatives. The objectives of the project are key guidelines in deciding whether an agency has adequately identified and considered all reasonable alternatives.  *Colorado Wild Inc. v. United States Forest Service,* 523 F.Supp.2d 1213, 1226 (D. Colo. 2007). "Where the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor."  *Id.* (citation omitted).  "Nevertheless, an agency may not 'define a project so narrowly that it forecloses a reasonable consideration of alternatives.'" *Id.* (citation omitted).  In addition, alternatives need not be studied if they are "remote, speculative . . . impractical or ineffective."  *Davis*, 302 F.3d at 1121.  The Court will "uphold [an agency's] discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail."  *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1528 (10th Cir. 1992) (citation omitted, alteration in original).

---

challenge to a project-level EA.

Consistent with the Improvements Project's purpose and need to improve skiing-related opportunities and to provide additional skiing/snowboarding terrain in a semi-backcountry area, the Forest Service reasonably evaluated two action alternatives and a no-action alternative. AR 4752-59, 6473-77, 6547-52. These alternatives were discussed in adequate detail and are reasonable in light of the objectives of the project. Plaintiffs have not identified any other alternatives that would have been appropriate in these circumstances. Accordingly, Plaintiffs have not carried their burden to demonstrate that the Defendants acted improperly.

5. <u>Improper Segmentation</u>

Finally, Plaintiffs argue that the Forest Service has violated NEPA by not considering the egress trail together with the rest of the Burnt Mountain Project. As discussed above, in response to Plaintiffs' administrative appeal, the Deputy Regional Forester determined that the Burnt Mountain egress trail, which is partly located on the Burnt Mountain Roadless Area, could not be constructed without additional NEPA analysis on the impact to the Roadless Area. However, "the revision and new decision need only deal with that part of the proposal within the Burnt Mountain Inventoried Roadless Area in Management Area 8.25 at Snowmass Ski Area." AR 5122. Plaintiffs contend that the impact of the egress trail should be analyzed together with the Burnt Mountain ski trails and lynx mitigation measures because they are connected actions. Defendants disagree and contend that the egress trail is independent of the other aspects of the Burnt Mountain Projects and can be considered in a separate analysis.

I agree with Defendants. The need for the egress trail is not triggered by creation of the new Burnt Mountain ski trails or the lynx mitigation measures since, as Plaintiffs have

urged, skiers are already using the Burnt Mountain area. Moreover, as Defendants argue, there is already an egress trail available for use. The proposed egress trail project can proceed independently of the other two components and the record does not reveal that it would have to be built before or after anything else. The egress trail appears to address existing needs, including improving snow conditions on the trail and allowing better emergency access. Moreover, I note that only the egress trail is located on Roadless Area land. I conclude that the Forest Service did not act arbitrarily or abuse its discretion in deciding that the impact of the egress trail on the Roadless Area could be examined in isolation.

Because I conclude that the Defendants acted within their authority and in accordance with the applicable law, I uphold the acceptance of the 2003 MPA and the NEPA analysis and decisions regarding the 2006 Improvements Project.

DATED at Denver, Colorado, on August 18, 2010.

BY THE COURT:

s/ Walker D. Miller
United States Senior District Judge